Zelda A. CORNELL, f/k/a Zelda A. Noyes, Appellee,

v.

Lois A. WUNSCHEL, Russell S. Wunschel and Clinton House Motel, Inc., Appellants.

No. 86–518.

Supreme Court of Iowa.

June 17, 1987.

Charles W. Brooke of Lane & Waterman, Davenport, for appellants.

George W. Pillers, Jr., and G. Wylie Pillers III of Pillers, Pillers & Pillers, P.C., Clinton, for appellee.

Considered by McGIVERIN, P.J., and LARSON, SCHULTZ, CARTER and LAVORATO, JJ.

McGIVERIN, Justice.

Zelda Cornell Wilson and her then husband Ronald Noyes leased the Clinton House Motel in Clinton, Iowa, from defendant Lois Wunschel, who was represented in negotiating the lease by her husband Russell Wunschel, a licensed attorney. This appeal involves the negotiations preceding plaintiff's lease of the motel. The case previously was before this court on a venue issue in *Cornell v. Wunschel,* 329 N.W.2d 651 (Iowa 1983). Following our remand, the case was tried and submitted to the jury on the theory that a fraudulent misrepresentation was made by defendant Russell Wunschel on behalf of all defendants that induced Zelda to enter into a lease-purchase arrangement. The jury returned a verdict in favor of Zelda. Defendants appeal from judgment entered on this verdict, challenging several of the jury instructions. We affirm in part, reverse in part, and remand.

I. *Background facts and proceedings.* We recite the facts in the light most favorable to the jury verdict. In the fall of 1980, Richard Snyder, a realtor from Ames, contacted Zelda (Wilson) and Ron Noyes. Snyder had information regarding two motels that had been placed for sale by Russell Wunschel on behalf of his wife. Defendant Clinton House Motel, Inc., a corporation controlled by the Wunschels, had owned the Clinton House Motel but conveyed it to Lois Wunschel before any transaction with Zelda. Zelda and Ron expressed some interest in purchasing one of the motels and travelled to Clinton to visit and generally inspect the Clinton House Motel, a 100 room, 8 apartment, restaurant and lounge facility. On the following day, Zelda, Ron and Snyder met with Russell Wunschel at his law office in Carroll to discuss the motels.

Wunschel discussed at length the renovation that was taking place at the Clinton House. He showed Zelda and Ron the project portfolio and stated the renovations were expected to cost $100,000. Ron and Wunschel also discussed the general physical condition of the Clinton House. At the close of the meeting, Zelda requested financial information on the motels for sale, specifically profit and loss reports. Wunschel presented Zelda with revenue and expense statements for December 31, 1979, and September 30, 1980. Wunschel provided Ron and Zelda with no additional financial information on the Clinton House.

After reviewing these documents with the realtor, Zelda and Ron made a condi-

tional offer to purchase the Clinton House. Wunschel rejected this offer and negotiations ceased. Ron and Zelda returned to their home in Arkansas.

Several days later, Wunschel contacted Ron and Zelda and urged them to return to Carroll to discuss purchasing the Clinton House Motel complex. They travelled to Carroll on November 2, 1980.

During three days of meetings in Wunschel's law office, Wunschel changed the concept of the contract from a purchase agreement to a lease-purchase arrangement. By doing so, Wunschel was able to provide a method for Zelda to purchase the motel complex even though she had no cash for a down payment. Wunschels also saved themselves a realtor's sales commission on a $2,000,000 sale, retained a depreciation write-off of $75,000 annually for five years, and suffered no immediate capital gains by this arrangement. The lease-purchase agreement that was ultimately signed provided for the assignment of a contract Zelda had executed for the sale of the Cheery Motel, a twenty-three unit facility that she had operated for seven years in Ottumwa, Iowa. The Cheery Motel contract, on which a $165,000 balance remained at the time of negotiations on the Clinton House, called for payments totalling nearly $400,000 from the purchasers to Zelda over the remaining eighteen years of the contract. In negotiations, Wunschel fixed a value of $80,000 for this contract and drafted an assignment, to be executed contemporaneously with the lease-purchase agreement, transferring ownership of the Cheery Motel contract and all monthly payments to his wife, Lois.

The lease also called for monthly rental payments of $13,500 for five years. These rental payments were net to Wunschels with Zelda held responsible for all maintenance and utilities on the facility during her possession of it. Wunschel assigned the $80,000 value to the Cheery Motel contract because the lease allowed partial payment of the rent, up to $5,000 per month, out of the value of the contract if Zelda was unable to meet the rental payment. She utilized this provision three times dur-

ing her occupancy of the motel. At the conclusion of the lease, the contract provided Zelda would purchase the motel complex for a sum equal to the greater of $2,000,000 or a factor times the average gross receipts of the motel.

At some point in the negotiations, Zelda became uncomfortable with the complexity of the arrangement. She suggested to Wunschel that perhaps she should seek advice of independent counsel. In response, Wunschel claimed he was competent, his work would be acceptable if independent advice were sought and he could save Zelda money by not involving another attorney.

Zelda and Ron signed the lease-purchase contract and Cheery Motel assignment drafted by Wunschel on November 5, 1980, without review of the documents by or advice from independent counsel. Zelda took possession of the motel complex and started operation on November 15. The motel operated without incident for a few months; however in April 1981, Zelda began to fall behind on some of her business obligations.

In October 1981 Lois Wunschel began eviction proceedings after several months of dispute over who was responsible for bills due but unpaid when Zelda took over the Clinton House. *See* Iowa Code ch. 648 (1981). In response, Zelda filed her original petition in this action on October 19. Her petition sought: (1) an injunction against the forcible entry and detainer suit; (2) an accounting of rents and offsets and damages for breach of contract; and (3) recission of the lease-purchase agreement. Her legal theories in the pleadings evolved from this time into a fraudulent misrepresentation claim.

Zelda returned possession of the motel complex to Wunschels in late January or early February of 1982.

After an interlocutory appeal on a venue issue, the case was tried and submitted to the jury on the theory that Russell Wunschel on behalf of all the defendants induced Zelda to enter the contract by fraudulently misrepresenting the profitability of the motel complex. The jury awarded

$147,803 actual and $50,000 punitive damages to plaintiff against defendants.

Defendants appeal from judgment entered on this verdict. They contend the trial court erred in submitting the issue of misrepresentation when there was insufficient evidence of any false representations. Additionally, Wunschels claim the court erred in instructing the jury: (1) on scienter; (2) that Zelda could rely on Wunschel's opinion of the motel's profitability if Wunschel had special experience or training; and (3) that if there was an attorney-client relationship, Wunschel had a duty to disclose all material facts and conflicts of interest to Zelda. Further, Wunschels assert that the court failed to instruct on proximate cause and erred in submitting: (1) Russell's responsibility as an attorney in failing to suggest to Zelda that she get her own attorney to look over the documents and counsel with her; (2) improper elements of compensatory damage; and (3) punitive damages.

Our review of this case is for correction of errors at law. Iowa R.App.P. 4. Additional facts will be recited as necessary to fully develop the issues in this case.

II. *Submission on theory of fraudulent misrepresentation.* The court instructed the jury that it could consider plaintiff's claim that the defendants induced plaintiff to contract for the lease and purchase of the Clinton House and to give defendants security in the event plaintiff could not perform. Defendants did this by falsely representing that the motel was operating at a profit or with a positive cash flow.

■ Recovery in a fraud action is premised on plaintiff's ability to show by a preponderance of clear, satisfactory and convincing evidence each of the following elements: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage. *B & B Asphalt Co. v. T.S. McShane Co.,* 242 N.W.2d 279, 284 (Iowa 1976).

Here, defendants dispute the sufficiency of the evidence to submit the theory of fraudulent misrepresentation to the jury.

In particular, defendants challenge instructions on misrepresentation and scienter.

A. *Misrepresentation.* Initially, Wunschels claim that there was no basis for the fraudulent misrepresentation theory because there was no affirmative misstatement of fact by defendants calculated to induce Zelda to enter into the Clinton House Motel lease.

Zelda, on the other hand, claims that Wunschel withheld information regarding the profitability of the motel complex which he had a duty to disclose. Specifically, Zelda asserts that Wunschel led her to believe that the business had a $6,000 profit in 1979 and that the tax records would support this representation. Wunschel led Zelda to believe the disclosed documents from 1979 and 1980 were reflective of the financial condition of the business. These same documents, however, failed to disclose: (1) Wunschel's cash contributions to the business in the amounts of $143,045 in 1979 and $105,000 in 1980; (2) the negative cash flow of the business in the amount of $134,035 in 1979 and $105,378 through October of 1980; and (3) the $65,785 net operating loss of the motel complex in 1979. Zelda argues that had Wunschel painted an accurate picture of the financial condition of the motel complex she would not have entered into the lease-purchase agreement.

■ Concealment of or failure to disclose a material fact can constitute fraud in Iowa. *Loghry v. Capel,* 257 Iowa 285, 289, 132 N.W.2d 417, 419 (1965); *see Lockard v. Carson,* 287 N.W.2d 871, 876–77 (Iowa 1980); *Ford v. Barcus,* 261 Iowa 616, 623, 155 N.W.2d 507, 511 (1968). To be actionable, the concealment must be by a party under a duty to communicate the concealed fact.

■ We conclude that there was sufficient evidence in the record to support submission of the misrepresentation instructions, numbers 10 and 11, if Wunschel was under a duty to disclose more than the revenue and expense statements in response to Zelda's inquiries as to the motel's profitability. We discuss Wunschel's duty to disclose in the next section.

■ B. *Scienter.* Scienter requires a showing that alleged false representations were made with knowledge that they were false. *B & B Asphalt Co.*, 242 N.W.2d at 284. Instruction 14 stated that the jury could find that Russell Wunschel, on behalf of defendants, made a representation with scienter if any of the following were true:

1. he made the representation with actual knowledge of its falsity;

2. he had superior knowledge or a special situation, such as a relationship of confidence, existed between the parties;

3. the representation made was false or misleading because of a failure to state additional qualifying matter; or

4. he made a representation capable of two interpretations.

In a special verdict, the jury found that an attorney-client relationship existed between Wunschel and Zelda. Based at least in part on this finding, the jury could have held Wunschels and their corporation liable for the consequences of Russell's misrepresentation.

Wunschels challenge Instruction 14 as to all paragraphs because there was insufficient evidence to support submission, and as to paragraphs 1, 2 and 4 because the statement of law in each of those paragraphs was inapplicable to a theory of concealment of or failure to disclose a material fact. Thus, they claim it was error to submit the case on those issues. *See B & B Asphalt Co.*, 242 N.W.2d at 285 (error to submit an issue having insufficient support in the evidence).

■ 1. *Actual knowledge of the falsity of the representation.* As Zelda argues, the jury could have found from the evidence adduced at trial the facts bearing on the profitability of the Clinton House Motel were peculiarly within Russell Wunschel's knowledge. Wunschel and his wife were the sole directors of Clinton House Motel, Inc., the former owner of the motel complex. As a director and the attorney for Lois Wunschel and the corporation, Russell Wunschel had access to all the financial documents relating to the motel. At the time of the negotiations on the lease-pur-

chase agreement, Wunschel retained the financial documents at his law office.

The jury could have concluded from this evidence that by furnishing Zelda with only part of the information Wunschel thought he could portray the business as profitable, while concealing the true financial condition of the business. He knew that the profitability of the motel was a determining factor for Zelda, yet he failed to disclose important information bearing on that matter. We find no error in the submission to the jury of this issue.

■ 2. *Superior knowledge or special situation.* A duty to disclose material facts arises under paragraph 2 of Instruction 14 when it is shown that one of the parties has superior knowledge or a special situation, such as an attorney-client relationship, exists between the parties. When either of these conditions is shown, we have required the party to make a full and truthful disclosure of all material facts within that party's knowledge. *See Kunkle Water & Elec., Inc., v. City of Prescott*, 347 N.W.2d 648, 653–54 (Iowa 1984); *Mills County State Bank v. Fisher*, 282 N.W.2d 712, 714–16 (Iowa 1979); *Loghry v. Capel*, 257 Iowa at 289, 132 N.W.2d at 421. Failure to do so is proof of scienter. This particular part of the jury instructions is under intense attack by Wunschels.

Zelda's theory of the case was that because Wunschel was an attorney he should be held to a high duty in terms of disclosure of financial information relating to the motel complex. The trial court instructed the jury on Zelda's theory, modifying Iowa Uniform Jury Instruction 26.5. Paragraph 2 of Instruction 14 read as follows:

A representation is made with scienter if the maker:

. . . .

2. is in a special situation or his means of knowledge are such as to make it his duty to know as to the truth or falsity of the representation. A relationship of trust or confidence between the maker and recipient creates a special situation placing upon the maker the duty to know the truth or falsity of the repre-

sentation. Likewise, such duty arises where the maker has superior knowledge of the facts. Under these circumstances, the maker also has a duty to disclose all material facts of which he is aware, or at least those favorable to his own position and adverse to the other. *If you find that an attorney-client relationship existed between Plaintiff* [Zelda Cornell Wilson] *and Defendant Russell S. Wunschel, then he had a duty to disclose all material facts and to disclose all conflicts of interest he may have with Plaintiff.*

(Emphasis added.) Wunschels direct their challenge to the italicized sentence of paragraph 2 of Instruction 14.

Certainly our discussion in the preceding section revealed that the evidence showed Russell Wunschel had knowledge superior to that of Zelda regarding the financial condition of the Clinton House Motel. There is little indication that Lois Wunschel knew anything about the business of the motel or its actual financial condition. Rather the evidence showed that Russell Wunschel and his accountants were the only people with knowledge of these matters. Even the motel manager when questioned by Ron and Zelda could not state with any certainty the financial condition of the motel as shown by its complete records. *See Kunkle Water & Elec.,* 347 N.W.2d 648 (Iowa 1984) (misrepresentation may occur when one with superior knowledge, dealing with inexperienced persons who rely on him, purposefully suppresses the truth respecting a material fact in the transaction). Russell Wunschel had special knowledge of the facts relevant to the motel's profitability. He also had more experience in owning and operating this type of multipurpose facility than did Ron and Zelda.

There was no error in instructing the jury on the duty to disclose that arises when one party has superior knowledge of the facts represented. Zelda presented sufficient evidence to warrant a jury's consideration of the issue.

A duty to fully and truthfully disclose all material facts also arises under paragraph 2 of Instruction 14 if there is a confidential relationship between the parties. Zelda argues that an attorney-client relationship existed between herself and Russell Wunschel and that he discouraged her from seeking the advice of independent counsel. It is not at all surprising that Wunschel disputes the existence of any attorney-client relationship with Zelda.

■ Zelda's brief on appeal goes so far as to suggest Wunschel may have violated certain provisions of the Iowa Code of Professional Responsibility. *See* DR 5–101(A), 5–105(B), (D). Whether Wunschel violated the ethical code is not a proper matter for review in this action. Zelda's reliance on the code of professional responsibility, however, may be helpful to her assertion that Wunschel was under a duty to disclose all material facts within his knowledge regarding the financial condition of the Clinton House Motel, irrespective of Zelda's inquiry into the matter.

■ Zelda testified at trial that during the negotiations she expressed her concern to Wunschel over the complexity of the dealings and her desire to have another attorney review the documents. She stated that Wunschel assured her that he could handle the documents for her and he was "making a fair contract for everyone." The key factor that swayed Zelda from seeking independent counsel was Wunschel's assertion that he could save her money if another attorney's services were not engaged. Zelda clearly thought Wunschel was representing her after that time. At trial, Wunschel disputed any conversations about his representation of Zelda's legal and financial interests.

There was sufficient evidence to warrant the submission to the jury of the issue whether there was a confidential relationship. The jury believed Zelda's version of the facts and returned a special verdict finding an attorney-client relationship existed between Russell Wunschel and Zelda at the time of the transaction.

Wunschels also argue that the instructions were erroneous as a matter of law because they specifically mentioned the at-

torney-client relationship and set forth the required disclosure if the jury determined an attorney-client relationship existed. They refer to Instructions 14 (scienter), 15 (creation of attorney-client relationship), and 15A (attorney's duty to disclose conflicts of interest). They argue that the application of these principles would require an attorney to encourage an individual seeking to purchase any asset of the attorney to seek the professional advice of another attorney on the proposed transaction, even when the asset is only an automobile.

 Zelda, however, points to the Iowa Code of Professional Responsibility as a yardstick against which we measure the conduct of an attorney. She argues that the code sets standards applicable to an attorney's conduct without regard to whether the action before us is brought by the Committee on Professional Ethics and Conduct, Iowa Sup.Ct.R. 118.5–.11, or by a private party.

We agree that the code of professional responsibility sets the standard for an attorney's conduct in any transaction in which his professional judgment may be exercised. This transaction, between Wunschels and Zelda, implicated Canon 5 concerns regarding both an attorney's personal financial interest in a business transaction with a client and the lawyer's representation of multiple clients. EC 5–2 cautions an attorney "not [to] accept proffered employment if his personal interests or desires will ... affect adversely the advice to be given or services to be rendered the prospective client." Further warnings are set forth in EC 5–3:

> The self-interest of a lawyer resulting from his ownership of property in which his client also has an interest or which may affect property of his client may interfere with the exercise of free judgment on behalf of his client. If such interference would occur with respect to a prospective client, a lawyer should decline employment proffered by him.... A lawyer should not ... make improper use of his professional relationship to

influence his client to invest in an enterprise in which the lawyer is interested.

Additionally, EC 5–11 states:

> A lawyer should not permit his personal interests to influence his advice relative to a suggestion by his client that additional counsel be employed. In like manner, his personal interests should not deter him from suggesting that additional counsel be employed; on the contrary, he should be alert to the desirability of recommending additional counsel when, in his judgment, the proper representation of his client requires it. However, a lawyer should advise his client not to employ additional counsel suggested by the client if the lawyer believes that such employment would be a disservice to the client, and he should disclose the reasons for his belief.

Finally, with respect to representation of multiple clients, EC 5–16 provides:

> In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent. If there are present other circumstances that might cause any of the multiple clients to question the undivided loyalty of the lawyer, he should also advise all of the clients of those circumstances.

Three disciplinary rules dictate the conduct of an attorney implementing the aspirations of these ethical considerations.

> Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.
>
> ....

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

. . . .

... [A] lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

DR 5–101(A), 5–104(A), 5–105(D); *see also* DR 5–105(B) (decline proffered employment if it will present multiple client conflict, unless all consent after full disclosure).

While the duty to disclose for scienter purposes envisions disclosure of all material facts to an adverse party if a confidential relationship exists, the code of professional responsibility requires not only full disclosure of the facts but also of the conflict of interest between the attorney and client or between the clients. After this disclosure, it is then for the client to decide whether additional counsel should be retained.

The code of professional responsibility clearly requires the attorney to be sensitive to the ethical concerns that arise when the attorney has a financial stake in the transaction or when the attorney represents individuals with differing interests in a transaction. *See Committee on Professional Ethics & Conduct v. Mershon*, 316 N.W.2d 895 (Iowa 1982) (attorney reprimanded for entering into business transaction with client without recommending that client obtain independent advice and without providing full disclosure, even though attorney did not act dishonestly and did not profit on the transaction).

In negotiating this $2,000,000 business deal, Russell established a $500,000 profit for the Wunschels' two-year investment in the Clinton House, plus his wife became the owner of the $165,000 balance and monthly payments on the Cheery Motel contract. Wunschel failed to disclose important financial information bearing on the profitability of the motel complex. Wunschel extracted from the accountant's reports and copied for Zelda the revenue and expense statements of the Clinton House from December 1979 and September 1980. Other documents in these compiled accountant's reports of the financial condition of the Clinton House would have disclosed Wunschel personally had infused over $100,000 per year in cash into the motel while his wife or the corporation had owned it. This would have alerted Zelda to the motel's questionable income potential. The record would support a finding that Wunschel failed to disclose these financial documents and matters and failed to detail his personal conflict of interest to Zelda. It would also support the conclusion that he discouraged Zelda from seeking the professional advice of independent counsel.

 Wunschels also argue that expert testimony was needed to establish a violation of the ethical standards. *See generally* Annotation, *Admissibility and Necessity of Expert Evidence as to Standards of Practice and Negligence in Malpractice Action Against Attorney*, 17 A.L.R.3d 1442 (1968) (expert testimony required to establish standard of care to which attorney's acts are compared). Here, our code of professional responsibility clearly sets forth the standard of disclosure. It is then the jury's duty, as in a legal malpractice case, to compare the attorney's conduct with the appropriate standard. We conclude the trial court did not err in instructing the jury on the ethical standard clearly announced in Canon 5 of our code of professional responsibility.

We conclude that there was both a legal and a factual basis under this record for the modification of the uniform jury instruction on scienter and for the court's additional instructions, numbers 15 and 15A, defining an attorney-client relationship and setting forth the duty to disclose contemplated by our code of professional responsibility. We find no error in the trial court's submission of the issue of the exist-

ence of an attorney-client relationship to the jury.

■ 3. *Failure to state additional qualifying matter.* No party disputes the submission to the jury of the issue whether Wunschel failed to disclose material that qualified the revenue and expense statements he gave to Zelda. *See* 37 Am.Jur. *Frand and Deceit* § 167, at 227 (1968) ("Although one may not be under a duty to speak concerning a matter such as ... income, nevertheless, if he undertakes to speak, ... in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those stated."); *see also* Restatement (Second) of Torts § 529, at 62–63 (1977). Wunschels argue that there was insufficient evidence for the jury to return a verdict on this theory, because Zelda never asked him for the documents that would have qualified those he already had disclosed.

We have set forth in detail the evidence presented on this issue at trial. After a thorough review of the evidence, we are convinced that substantial evidence to support the jury's finding can be found in the record.

■ 4. *Representation capable of two interpretations.* Finally, Wunschels argue that there was no basis on which to submit to the jury paragraph 4 of Instruction 14 regarding ambiguous representations. They also argue that the ambiguous representation instruction was inapplicable to this failure to disclose situation.

Zelda argues that at least two interpretations of the disclosed documents existed: the business was making a small profit each year after the payment of all its obligations or, as Wunschel had stated, business was improving with no clear picture of the financial situation at the motel. Wunschel's failure to disclose all relevant financial documents made this ambiguity possible. *See* Restatement (Second) of Torts § 527, at 61–62 (1977).

We conclude that Zelda presented sufficient evidence to support the submission of this issue to the jury. Therefore, we find no error in Instruction 14. For reasons stated previously we also find no error in Instructions 15 and 15A.

Our conclusion on Instruction 14 in no way excuses the defrauded party's duty to investigate representations made to that party. *See Lockard v. Carson,* 287 N.W.2d 871, 877–78 (Iowa 1980); *Christy v. Heil,* 255 Iowa 602, 610–11, 123 N.W.2d 408, 412–13 (1963). The fact finder still examines the conduct of the defrauded party to determine if the party has exercised ordinary caution and diligence in investigating the representations made. *Id.* Here, Zelda requested financial documentation of the Clinton House's profitability. After only partial disclosure, Wunschel induced her not to investigate further by discouraging her from seeking the advice of independent counsel.

■ III. *Damages.* Wunschels also claim numerous errors in the trial court's instruction to the jury on damages. Initially they argue that the court did not sufficiently instruct the jury on the causation element of the fraudulent misrepresentation theory. While it is true that the court did not give a specific instruction on causation, the instructions when read as a whole clearly indicated that the jury could award damages to plaintiff only if those damages actually resulted from plaintiff's reliance on the defendants' false misrepresentations, and if sufficient evidence was introduced to support the award. Thus, we find no error in the court's failure to give a specific causation instruction.

The court submitted this case on a failure to disclose material facts theory of fraudulent misrepresentation. It instructed the jury that an award could be made for the following elements of damages if those damages were proved by a preponderance of the evidence: (1) the present value of the Cheery Motel contract and the reasonable value of the net receipts of that contract between November 1980 and February 1986; (2) the unpaid business and tax obligations attributable to Zelda's operation of the Clinton House; (3) the unpaid business obligations attributable to Wunschel's

operation of the Clinton House (*e.g.,* employee vacation wages, tenant security deposits, credit card advances and guest billings paid); (4) Zelda's loss of earnings sustained by entering into the lease-purchase agreement; and (5) the medical bills, future disability and earnings loss, and pain and suffering resulting from Zelda's mental distress attributable to defendants' fraudulent misrepresentations.

Wunschels attack all aspects of the compensatory damage instruction. They base their claims on our prior adherence to the "benefit-of-the-bargain" rule for damages in misrepresentation cases. *See Freeman v. Bonnes Trucking, Inc.,* 337 N.W.2d 871, 879 (Iowa 1983); *Holcomb v. Hoffschneider,* 297 N.W.2d 210, 213 (Iowa 1980).

Plaintiff does not dispute our prior application of the benefit-of-the-bargain rule, but argues that the application of the rule would be grossly inequitable here. Plaintiff asserts that the trial court was correct in allowing the jury to award proven consequential damages as well as benefit-of-the-bargain damages under the rule in *Lamasters v. Springer,* 251 Iowa 69, 99 N.W.2d 300 (1959). In *Lamasters,* we allowed the recovery of benefit-of-the-bargain and consequential damages for fraudulent misrepresentation. *See* 251 Iowa at 76–77, 99 N.W.2d at 304. This is basically the rule adopted in Restatement (Second) of Torts § 549 (1977). Under the Restatement rule, a defrauded party may only recover the benefit of that person's bargain and consequential damages. This is a compromise position between strict application of the benefit-of-the-bargain and the out-of-pocket rules. Most commentators, however, recognize the alternative measure of recovery for "out-of-pocket" losses. D. Dobbs, *Handbook on the Law of Remedies* § 9.2, at 595 (1973) [hereinafter Dobbs]; C. McCormick, *Handbook on the Law of Damages* § 121, at 449 (1935); W. Prosser & W. Keeton, *Handbook on the Law of Torts* § 110, at 767 (5th ed. 1984) [hereinafter Prosser & Keeton].

The purposes of the two rules will help guide our selection of the applicable rule in this case. The purpose of the benefit-of-the-bargain rule is to put the defrauded party "in the same financial position as if the fraudulent representations had been in fact true." Dobbs § 9.2, at 595. Some courts have turned to the alternative out-of-pocket measure of damages when application of the benefit-of-the-bargain rule will not make the defrauded party whole, as when the defrauded party has returned the property about which the fraudulent misrepresentation had been made. *Fong v. Town & Country Estates, Inc.,* 600 F.2d 179 (8th Cir.), *cert. denied,* 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979); *Rice v. Hilty,* 38 Colo.App. 338, 559 P.2d 725 (1976). The out-of-pocket recovery is then used to give the defrauded party "the difference between the value of what he has parted with and the value of what he has received." Prosser & Keeton § 110, at 767; *see Fong,* 600 F.2d at 182 ("[A]ward of 'out-of-pocket' damages is premised upon the assumption that the injured party has returned the property and is entitled to the expenses which were incurred in accepting and then rescinding the agreement.").

 Although the trial court applied the benefit-of-the-bargain plus consequential damages rule, we think it more appropriate given the facts of this case, specifically due to the return of the motel by Zelda to the landlord, to apply the out-of-pocket rule. We conclude that the trial court erred in submitting this case to the jury under the benefit-of-the-bargain measure of damages. We mention this conclusion here because a new trial on damages is necessary in any event for the reasons stated in subdivision III(D) below.

We turn to the elements of damage, submitted by the court and challenged by defendants, and address the possible submission of those damages in the new trial that we direct hereafter.

A. *Value of the Cheery Motel contract.* The court instructed the jury that damages could be awarded to plaintiff for the present value of the Cheery Motel contract at the time of trial and the amount of net receipts by defendants from that contract

between November 1980 and February 1986.

Under the out-of-pocket measure of damages, the defrauded party should be compensated for the amount that party lost by dealing with the defrauding party when it is apparent that no dealing would have occurred if the facts had been disclosed. *Scholz Homes, Inc. v. Larson,* 411 F.2d 342, 348 (7th Cir.1969). In *Scholz Homes,* plaintiff in a fraudulent misrepresentation action recovered the value of assets it transferred to the defrauding party plus expenses incurred as a result of the transaction, reduced by the amounts received by plaintiff under the deal. *Id.* at 349.

Under this line of reasoning, parties have also recovered down payments on contracts for the sale of a business in situations in which the sale was induced by fraud. *See Rice v. Hilty,* 38 Colo.App. at 340, 559 P.2d at 727; *see also Warfield v. Richey,* 167 Cal.App.2d 93, 99–100, 334 P.2d 101, 102–03 (1959) (entitled to return of deposit and amount of improvements less value of use and occupancy of premises when fraudulently induced into five-year lease of hotel); *Salter v. Heiser,* 39 Wash.2d 826, 833, 239 P.2d 327, 331–32 (1951) (entitled to a return of deposit when fraudulently induced into leasing a resort property).

■ Defendants would be entitled to present evidence to support an offset of damages assessed for the Cheery Motel contract regarding the real estate commission they were required to pay on the contract after Zelda's assignment of the Cheery Motel contract to Lois Wunschel and for rents deducted from the contract balance at Zelda's request.

If sufficient evidence exists to warrant submission to the jury of this issue, we conclude that in the new trial the court may instruct the jury regarding an award of damages for Zelda's loss of the Cherry Motel contract and payments thereon consistent with this opinion.

■ B. *Unpaid business and tax obligations.* Under the out-of-pocket rule, generally a defrauded party is not entitled to damages for operating losses. *Salter v.*

*Heiser,* 39 Wash.2d at 834, 239 P.2d at 331–32 (net operating loss is recoverable under the benefit-of-the-bargain rule, however). Courts allowing the recovery of operating losses under either rule require that the losses be certain and ascertainable, and that the claimant prove that the losses were proximately caused by the fraud. *See Reid v. El Paso Constr. Co.,* 498 S.W.2d 923, 925 (Tex.1973).

■ The claim for unpaid business obligations to some extent may fall within the category of operating losses. On remand, the jury will have to decide the amount of Zelda's liability for the real estate taxes. These taxes were apportioned in the lease. That portion attributable to her is not compensable because it represents a cost of her operation of the business; if she had paid the taxes prior to this action, the payment would have added to operating losses. To the extent the taxes are attributable to Wunschels, Zelda should not recover, but Wunschels should be responsible for their share of the outstanding taxes, penalties and interest. Other unpaid business obligations attributable to Zelda's operation of the Clinton House will remain her liability and cannot be charged to defendants.

■ Zelda claimed at trial that she was entitled to damages for business obligations paid by her that accrued while Wunschel operated the motel complex and remained unpaid when possession passed to Zelda. Wunschel argued that these were out-of-pocket losses, and we agree. At the new trial, Zelda will be entitled to an instruction authorizing damages for any employee vacation wages, tenant security deposits, American Express credit card advances and guest bills which were the obligation of defendants but were paid by plaintiff, if she introduces sufficient evidence to warrant submission of the issue to the jury.

■ C. *Lost profits.* It appears that Zelda would not be entitled to recover lost profit damages in this action due to the speculative nature of such an award under this record. The business that she took over had not operated at a profit in over

two years and Zelda had not run a similar enterprise in a like environment. In any event, in subdivision III(B) we adopted the out-of-pocket rule which bars recovery of lost profits in this factual situation. We conclude that Zelda is not entitled to a lost profits damage instruction in this case.

■ *D. Damages for mental distress.* One of the keys to an award of damages for fraudulent misrepresentation is that the party committing the fraud could have contemplated the claimed damage as a consequence of the fraud at the time the misrepresentation was made. Damages for mental distress are not ordinarily contemplated in a business transaction; thus, few courts have recognized their availability as an element of fraud damages. *See Walsh v. Ingersoll-Rand Co.,* 656 F.2d 367, 370–71 (8th Cir.1981); *Moore v. Slonim,* 426 F.Supp. 524, 527 (D.Conn.), *aff'd,* 562 F.2d 38 (2d Cir.1977) ("It is black letter law that damages for mental distress are not ordinarily available in a cause of action for a business fraud."); *Ellis v. Crockett,* 51 Hawaii 45, 52, 451 P.2d 814, 820 (1969) (emotional distress damages recoverable only if amounting to separate intentional tort); *Harsche v. Czyz,* 157 Neb. 699, 710, 61 N.W.2d 265, 272 (1953) (prejudicial error to instruct jury on emotional distress in fraud case, even though damages for emotional distress recoverable for breach of promise of marriage). *But see McNeill v. Allen,* 35 Colo.App. 317, 325, 534 P.2d 813, 819 (1975). We adhere to the view announced by Professor Dobbs,

> deceit is an economic, not a dignitary tort, and resembles, in the interests it seeks to protect, a contract claim more than a tort claim. For this reason, though strong men may cry at the loss of money, separate recovery for mental anguish is usually denied in deceit cases.

Dobbs § 9.2, at 602.

■ In the former proceedings in this case, the trial court erred in submitting this issue to the jury under either the benefit-of-the-bargain or out-of-pocket measure of damages. Submission of an element of damages for mental distress in a business fraud case constitutes prejudicial error.

This error can be corrected only by our reversal and direction of a new trial. At the new trial, the jury should not be instructed to consider damages for Zelda's medical bills, future disability, earnings loss and pain and suffering attributable to her mental distress.

*E. Punitive damages.* Wunschels argue that punitive damages should not have been submitted in this case. They acknowledge that generally a recovery of punitive damages in a suit alleging a fraudulent sale "will be allowed only where the fraud is an aggravated one, as where it is malicious, deliberate, gross, or wanton." 37 Am.Jur.2d *Fraud and Deceit* § 347, at 466 (1968). We upheld an award of punitive damages in *Grefe v. Ross,* 231 N.W.2d 863, 865, 868 (Iowa 1975), when plaintiff was induced to purchase a franchise based on the corporation-defendant's stability, growth and profit potential, when in fact the business had not profited in three years.

■ We conclude that the trial court did not err in submitting the issue of punitive damages to the jury; however, no ground exists on which to uphold the award of punitive damages because actual damages sustained under the applicable theory of damages have not yet been shown. *See Pringle Tax Serv., Inc. v. Knoblauch,* 282 N.W.2d 151, 154 (Iowa 1979). Therefore, we reverse the award of punitive damages for retrial along with the other issues in the case. On remand the court may need to consider Iowa Code chapter 668A (1987). *See Barnhouse v. Hawkeye State Bank,* 406 N.W.2d 181, 184 n. 2 (1987).

*IV. Disposition.* In summary, we conclude that the trial court committed no error in instructing the jury on the theory of fraudulent misrepresentation and the attorney-client relationship; however, the court erred in connection with the compensatory damage instruction. We have considered all of defendants' other arguments and find no merit in them. Therefore, we affirm in part, reverse in part, and remand for a new trial as to all issues. Costs are

taxed one-half to plaintiff and one-half to defendants.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.