**NATIONAL BANK & TRUST CO.,**
Plaintiff/Cross–Appellant,

v.

**Frank L. CAMPBELL,**
Defendant/Cross–Appellee,

**Frank L. CAMPBELL,**
Plaintiff–Counterclaimant/Appellant/
Cross–Appellee,

and

**B. Iline Campbell,**
Plaintiff–Counterclaimant,

v.

**NATIONAL BANK & TRUST CO.,** Coun-
ter–Claim Defendant/Appellee/
Cross–Appellant.

No. 88–89.

Court of Appeals of Iowa.

Sept. 26, 1990.

Emil Trott, Jr., of Barrett & Trott, Des Moines, for appellant Frank L. Campbell.

William R. Clark, Jr. and Ross A. Walters of Herrick, Langdon & Langdon, Des Moines, for appellee National Bank & Trust Co.

Considered by OXBERGER, C.J., and DONIELSON and SCHLEGEL, JJ.

SCHLEGEL, Judge.

Defendant-counterclaimant Frank L. Campbell appeals a trial court judgment denying money damages. Plaintiff and counterclaim-defendant National Bank and Trust Co. cross-appeals the same judgment finding that it had committed fraud. We affirm.

After a ten-day bench trial, the court issued a lengthy and detailed decision including findings of fact and conclusions of law, from which we borrow extensively. This is a difficult and complicated case, and only a basic recitation of the facts can be undertaken here.

The trial court found and we agree that "Campbell is a person of more than average business intelligence, operating a complex admixture of elevator, livestock, tiling and farm businesses, and his wife [B. Iline Campbell, from whom he is now divorced,] was active in the various business pursuits." Campbell also holds a real estate agent's license. By late 1980, the Campbells jointly held title to a 1155-acre farm on which they cultivated grain and livestock. Through Campbell Grain they owned two elevator businesses. Campbells held numerous bank accounts both personally and through their various business enterprises at several local banks.

Campbell Grain experienced financial difficulties aggravated in early fall 1979 by Citizens State Bank's (CSB) change in policy requiring funds be collected before the corporation could draw on its account. Campbell sought and received short term operating loans from National Bank & Trust Company (NBT). At the same time NBT gave immediate credit on the corporation's third-party checks, but by late 1980, this degenerated to check "kiting."[1] The trial court found that both NBT and Campbell knew Campbell was "in essence writing the amounts of his own [unsecured] loans" on the "float." The court also found NBT had led Campbell to believe that the procedures were acceptable. NBT eventually surpassed legal lending limits. Because of the debt structure, the court noted, "[b]oth the Campbells and the Bank had too much to lose to stop the transactions...."

William Carter, president and a director of NBT, and Dale Bankus, a loan officer, were Campbells' primary contacts.[2] Short-

---

1. "Kiting" is defined as

   [t]he wrongful practice of taking advantage of the float, the time that elapses between the deposit of a check in one bank and its collection at another. The method of drawing checks by which the drawer uses funds which are not his by drawing checks against deposits which have not yet cleared through the banks. Black's Law Dictionary 783 (5th ed. 1979). After calculating the amount needed to cover checks drawn on insufficient funds at the corporation's CSB account, NBT would issue a cash-ier's check that Campbells would deposit at CSB. Campbells paid NBT from their NBT accounts containing immediate credit on uncollected third-party checks. Later, with NBT's knowledge, Campbells paid NBT with checks drawn on insufficient funds at CSB. NBT devised a novel charge for the cashier's check utilizing interest rates rather than typical flat fees. Apparently, no charges have been filed against any of the participants.

2. Carter resigned in 1982, and Bankus was terminated in 1984. "Although there is some indi-

ly before a consultant was to examine accounts in April 1981, Carter disclosed the predicament to his board of directors. NBT immediately sought security for the float, which sometimes exceeded $1.1 million, and to bring NBT in line with lending limits and avoid criminal or civil liability. In compliance with NBT requests, Campbells liquidated some assets and entered into numerous transactions required by NBT.

Campbells signed numerous instruments in blank, issued mortgages, and personally guaranteed corporate debt at the behest of NBT. This included "paper transfers" to two Campbell children of part of the unsecured debt, for which all parties understood Frank and Iline would remain liable. The series of "paper transfers" culminated in, and the crux of our problem here developed from, a quit claim deed of the 1155–acre farm to NBT in late April 1981. The trial court states:

> [T]he Court believes and finds, that Frank repeatedly indicated that even if a quit claim deed were given, he was not selling the farm. The Court specifically finds that the Campbells believed, and were led to believe by Bankus, that the Quit Claim Deed was merely yet another "paper transaction" to satisfy banking examiners. . . .
>
> *       *       *       *       *       *
>
> . . . The Court finds the Campbells signed the Quit Claim Deed to their farm in direct reliance upon representations by both Bankus and Carter that the deed would not change ownership, management or possession of the farm.

After the deed, Campbells treated the farm as their own, paying accrued real estate taxes and a mortgage installment to a lender and making improvements. NBT assumed responsibility for making these payments in 1982 and 1983. During that time, NBT insisted on a lease to satisfy bank examiners and set rent equal to the

mortgage payment to the third-party lender, insurance, and taxes.

Deed in hand and estimating the value of the farm at $1500 per acre, less an $800,000 mortgage, NBT took the $648,000 worth of notes assumed by the Campbell children off its books. NBT also reduced a Campbell Grain debt by $120,700. Campbells claimed the farm should be valued at $2200 per acre, but the court determined fair market value was $1750 per acre, or $2,021,250, at the date of the deed. We concur in that valuation.

In 1983 NBT exercised more control over the farm, notifying real estate brokers to reduce the asking price the parties had agreed to. NBT also monitored planting and production. NBT finally served Campbells with termination of the farm tenancy and sued when Campbells failed to pay the 1983 "rent." [3] Campbells brought several counterclaims, all of which were dismissed except the cause of action based upon the fraud of NBT. No appeal of the court's dismissal of those counterclaims has been taken.

The trial court dismissed NBT's action. It determined that the quit claim deed should be set aside to the extent it affected relationships between the parties before it, and it found Campbells entitled to a money judgment equal to the equity they lost by NBT's interference with and loss of the real estate. It noted, however, that "[b]oth [parties] were not only involved but voluntarily continued (for their own reasons) the clearly questionable procedures that brought them to this Court." The court, therefore, considered NBT's amendments seeking setoff amounts owed by Campbells and determined that equitable principles demanded setoffs.

On appeal, Frank Campbell challenges the trial court's calculation of damages and inclusion of setoffs against the award to the Campbells. He also argues that he

cia of trust and loyalty and confidence," the trial court concluded there was no fiduciary or confidential relationship with Campbells.

**3.** Later, when neither party made the mortgage payment, the third-party lender foreclosed in a

separate action, and deficiency judgment was entered against Campbells. The redemption period expired in September 1986. The parties agreed that this mooted issues of equitable relief (quieting title) pursued by Campbells.

should receive punitive damages. On cross-appeal, National Bank & Trust contends that a finding of fraud is unsupported, and it urges that if there was fraud, there either was no injury or the trial court calculated the damages correctly.

■ The parties disagree on whether the cause was tried in law or equity, and consequently, they disagree on our scope of review. At several points throughout its decision, the trial court uses equity principles, and it seems clear that the trial court considered the case in equity. Moreover, despite its protestations, it appears that Campbells sought relief in equity. When the parties and the court treat a claim as equitable in nature, and it is tried on that theory, we will consider it as equitable on appeal. *Burrell v. Burrell*, 256 Iowa 490, 493, 127 N.W.2d 78, 80 (1964). Our review, therefore, is de novo. Iowa R.App.P. 4. We will give weight to the trial court's findings of fact, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R.App.P. 14(f)(7).

■ The Iowa Supreme Court has enumerated the elements of fraud as: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage. *Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987) (citing *B & B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 284 (Iowa 1976)); *Gipp v. Lynch*, 226 Iowa 1020, 1027, 285 N.W. 659, 652 (1939). The trial court here found Campbells had proven these elements. It stated: "The representations made by Bankus and Carter to induce the signing of the Quit Claim Deed were false, were made with the intent to deceive the Campbells, and resulted in injury."

■ Having reviewed the record de novo, we agree with the trial court's finding. It is clear from the record that NBT or its representatives made false, material representations to the Campbells about the effect of the quit claim deed. We note the trial court expressly found Bankus's and Carter's stories about the effect of the deed particularly unconvincing and found Campbells' stories "far more credible." The trial court found, and we agree, that NBT's representations were false insofar as they intended to retain the property; thus, NBT's assertions that there was neither falsehood nor materiality and that its officers recognized Campbell's equity interest seem a bit disingenuous. Furthermore, NBT's assertion that there was no scienter finding and no evidence to support such a finding is baseless. The record shows, the trial court found, and we agree, that NBT intended to retain the property and made contrary representations to the Campbells it knew to be false. *See Cornell*, 408 N.W.2d at 375 ("Scienter requires a showing that alleged false representations were made with knowledge that they were false." (citing *B & B Asphalt Co.*, 242 N.W.2d at 284)). These findings subsume the scienter requirement.

■ In considering the issue of damages, the trial court allowed NBT's motion to amend in conformance with the evidence. As NBT correctly points out, the trial court has discretion to grant or deny such motions. *Gosha v. Woller*, 288 N.W.2d 329, 332 (Iowa 1980). All of the facts concerning the float debt, the third-party mortgage, and the real estate tax payments were put into the record in the course of Campbell's case. Thus, Campbell could not have been surprised or greatly prejudiced. Iowa R.Civ.P. 106; *see* 6A C. Wright, A. Miller, M. Kane, Federal Practice and Procedure § 1495, at 57–60 (1990); *see also Thomas v. Blecker*, 181 N.W.2d 129, 131 (Iowa 1970). This would seem particularly true given that trial was to the court, and not a jury. We also find Campbell's technical arguments against this decision are meritless. The trial court properly granted the motion.

■ In determining damage awards, the trial court stated:

> [T]his Court concludes the Campbells are entitled to damages in the amount of their "equity" in their farm at the time of the Quit Claim Deed (April 24, 1981).

... [I]n setting aside the Quit Claim Deed as a conveyance, this Court is compelled to restore the consideration paid by the Bank for the farm as well as the benefit received by the Campbells therefrom. [Case citation omitted.]

... [T]he Bank is entitled to an offset for the $932,500 paid as a write-down of the indebtedness, plus interest; the $220,000 in mortgage payments made by the Bank, plus interest; and approximately $16,000 representing taxes paid by the Bank, plus interest; less the value of the crop paid as rent for 1982 ($44,-977.73). [Citation to record omitted.]

... [T]he Bank is entitled to an offset for the amount still owing to the Bank under the notes of the Campbells and Campbell Grain Corporation.... [T]hat amount to December 17, 1986, is approximately $408,000 with per diem accumulation since that date.

The court found that Campbells' equity was $1,221,250, the fair market value less the mortgage to the third party lender. Finally, the trial court concluded, "Since the offset amounts ... substantially exceed the amount of damages, ... no damages are available to the Campbells as a result of the Bank's actions of fraud herein." The court then required NBT to "release of record all remaining financial statements and mortgages of record concerning any property of Frank or Iline Campbell or Campbell Grain Corporation" including anything relating to the Campbell children. NBT asserts these losses exceed $1.5 million.

We agree with and adopt the trial court's determination of damages. To the extent the trial court suggests that it was compelled to allow restitution to the party that committed fraud, we must disagree. Nevertheless, we are convinced that the trial court here viewed all of the facts and circumstances and not so much sought to restore NBT to its status quo ante as it sought to do equity between these parties.

Making much of the trial court's fraud finding, Campbell urges that the trial court should have awarded various amounts as benefit-of-the-bargain, consequential, or out-of-pocket damages. Based upon our de novo review of the record, and the shenanigans in which these parties engaged, we must agree with the trial court that neither party should benefit. The trial court adequately apportioned the damages based on the equities.

■ Campbell's request for punitive damages is not supported by the record. "Punitive damages are always discretionary, and are not a matter of right." *Berryhill v. Hatt*, 428 N.W.2d 647, 656 (Iowa 1988). In *Cedar Falls Building Center, Inc. v. Vietor*, 365 N.W.2d 635, 639–40 (Iowa App.1985), we noted

> exemplary damages may be awarded where defendant acts maliciously, but malice may be inferred where defendant's act is illegal or improper; where the nature of the illegal act is such as to negative any inference of feelings toward the person injured, and is in fact consistent with a complete indifference on the part of the defendant.

Despite Campbell's description of events, we are not convinced that the record supports an award of punitive damages. Moreover, we agree with the trial court's assessment that any punitive damages awarded would not exceed the amount due NBT and caused by the Campbells' dealings.

Based on our de novo review, we affirm the trial court's decision. The costs of this appeal shall be taxed equally between the parties.

AFFIRMED.