**MIDWEST HOME DISTRIBUTOR,
INC. d/b/a Midwest Carpets,
Inc., Appellee,**

v.

**DOMCO INDUSTRIES LTD., Appellant.**

No. 96–1731.

Supreme Court of Iowa.

Sept. 23, 1998.

Rehearing Denied Nov. 9, 1998.

Stephen J. Holtman and David A. Hacker of Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, for appellant.

Robert D. Houghton, Connie Alt, and Nancy J. Penner of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellee.

Considered by HARRIS, P.J., and LARSON, LAVORATO, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

A floor covering distributor sued a floor covering manufacturer for damages arising out of a distributor relationship between the two. The jury awarded the distributor compensatory damages on multiple theories of recovery and punitive damages. The theories included promissory estoppel, breach of fiduciary relationship, fraudulent misrepresentation, and fraudulent concealment. In its appeal, the manufacturer raises numerous issues. The decisive issues, however, are whether sufficient evidence supports the recovery for fraudulent misrepresentation and punitive damages, whether an instruction on one of the elements of the misrepresentation claim was supported by the evidence, and whether several evidentiary rulings were correct. We affirm.

## I. Facts.

We state the facts in the light most favorable to the jury verdict. Midwest Home Distributor, Inc. is a floor covering distributor operating in Cedar Rapids. Domco Industries Ltd. is a Canadian company and manufactures vinyl floor covering. In October 1988 Midwest became a Domco distributor following a number of discussions between Gary Skogman of Midwest and Tom Ward of Domco.

At the time, Domco was trying to establish a presence in the U.S. market, a market dominated by several U.S. floor covering manufacturers. Midwest had a dealer network covering Iowa and was seeking a vinyl line.

During his discussions with Ward, Skogman sought a long-term distributorship in which Midwest would be the only stocking distributor in the state. A stocking distributor has certain advantages over other dealers in the territory. For example, a stocking distributor can offer manufacturer rebates to dealers in its territory. Neighboring distributors can sell in the stocking distributor's territory but cannot offer rebates and are at a freight disadvantage.

Domco represented to Midwest that it was growing and increasing its market share in the United States. In addition, Domco represented to Midwest that Midwest would be the only stocking distributor of Domco's product in Iowa. Based on these representations, Midwest became a Domco distributor in October 1988. In doing so, Midwest gave up opportunities to pursue other vinyl lines and invested substantial finances, time, and human resources in promoting Domco's product.

Throughout 1989 Midwest concentrated on developing dealers for Domco's product in western Iowa. During this time Frank Smith succeeded Ward, and Richard Abramowicz was Domco's vice president for U.S. sales. During 1989 both men reassured Midwest of its status as a sole stocking distributor. Despite these assurances, Smith began secretly pursuing a distributorship with Onthank Company in Des Moines as early as March of 1989.

In December 1989 Smith and Abramowicz came to Cedar Rapids and presented Skogman with projected sales figures based on Midwest having all the Domco sales in Iowa. The two concealed from Skogman the fact that Domco would soon add Onthank as another stocking distributor in Iowa. This would mean that Onthank would capture a large share of these sales. Following their meeting with Skogman, Smith and Abramowicz proceeded directly to Onthank to finalize its deal with that company.

Skogman learned of Onthank's appointment in January 1990. Skogman immediately protested the appointment to Jack Lee, a Domco vice president. Lee assured Skogman that Onthank's appointment would not harm Midwest's projected profits because (1) Domco would restrict Onthank's territory to fifty miles around Des Moines and (2) Domco was growing and increasing its market share in the United States.

Actually, Domco was not growing. In addition Onthank's written agreement with Domco, which was reached at the same time Lee was placating Skogman, provided that Domco would support Onthank outside a fifty-mile radius around Des Moines.

Skogman again complained to Lee, this time by letter. Lee did not respond.

In early January 1991, Onthank realized that the state could only support one stocking distributor. Onthank began pressuring Domco to terminate Midwest's distributorship so that Onthank would be the only stocking distributor in Iowa. After a series of letters, meetings, and telephone conversations during which Onthank and Domco discussed and agreed that Domco would terminate Midwest's distributorship, Domco did so effective August 1993.

## II. Proceedings.

Midwest sued Domco, alleging breach of contract, promissory estoppel, breach of fiduciary relationship, fraudulent misrepresentation, and fraudulent concealment. Midwest also sought punitive damages. The district court submitted all of these theories to the jury. The jury rejected the breach of contract theory but found for Midwest on the

remaining theories. The jury awarded Midwest $400,000 in compensatory damages and $750,000 in punitive damages. In an answer to a special interrogatory, the jury assigned the punitive damages to "fraud."

The district court overruled Domco's motions for judgment notwithstanding the verdict (JNOV) and new trial regarding the verdicts for compensatory and punitive damages.

On appeal, Domco raises numerous issues. We need only consider whether the district court erred in (1) overruling Domco's motion for JNOV challenging the sufficiency of the evidence as to the fraudulent misrepresentation and punitive damages claims, (2) overruling Domco's motion for new trial because of an instruction on the justifiable reliance element of the fraudulent misrepresentation claim, and (3) overruling Domco's objections to the admissibility of testimony from former Domco distributors and a former Domco employee.

## III. Scope of Review.

We review district court rulings on motions for JNOV for the correction of errors at law. Iowa R.App. P. 4; *Magnusson Agency v. Public Entity Nat'l Company–Midwest,* 560 N.W.2d 20, 25 (Iowa 1997). We view the evidence in the light most favorable to the party against whom the motion was made, taking into consideration every legitimate inference that may fairly and reasonably be made. Iowa R.App. P. 14(f)(2); *Magnusson,* 560 N.W.2d at 25. The motion must stand or fall on the grounds raised in the motion for directed verdict. *Magnusson,* 560 N.W.2d at 25.

We inquire whether sufficient evidence exists to justify submitting the case to the jury. *Id.* When substantial evidence to support each element of the plaintiff's claim does not exist, the motion should be granted. *Id.*

We review district court rulings on motions for new trials for abuse of discretion. *Id.* at 30; Iowa R.App. P. 14(f)(3). A new trial may be ordered when sufficient evidence does not support the jury verdict and the verdict fails to effectuate substantial justice. *Magnusson,* 560 N.W.2d at 30.

Evidence is substantial if reasonable minds would find the evidence presented adequate to reach the same findings. *Id.* at 25.

Generally, we review evidentiary rulings concerning relevancy and materiality for abuse of discretion. *See Sanford v. Meadow Gold Dairies, Inc.,* 534 N.W.2d 410, 412 (Iowa 1995).

## IV. Sufficiency of the Evidence.

**A. The fraudulent misrepresentation claim.** To establish its fraudulent misrepresentation claim, Midwest had to prove all of the following elements: (1) Domco made a representation to Midwest; (2) the representation was false; (3) the representation was material; (4) Domco knew the representation was false; (5) Domco intended to deceive Midwest; (6) Midwest acted in reliance on the truth of the representation and was justified in relying on the representation; (7) the representation was a proximate cause of Midwest's damages; and (8) the amount of damage. *See Magnusson,* 560 N.W.2d at 27–28. Midwest had to prove each of these elements by a preponderance of clear, satisfactory, and convincing evidence. *See id.*

Domco raises a sufficiency of the evidence challenge only as to the elements of causation and damages and therefore concedes the evidence is sufficient as to the other elements.

The jury answered several special interrogatories finding that Domco made the following intentional misrepresentations:

1. [A]fter October 1988 ... Midwest would be the only stocking distributor of Domco product in Iowa.

2. [O]n or about December 1989, [Domco agents] made projections to Midwest based on Midwest having all the Domco sales from the state of Iowa.

3. [I]n January 1990 [Domco agents] made a representation to Midwest that Midwest could reach projected sales levels even with Onthank's presence in Des Moines because Domco U.S. was growing and/or increasing its market share in the U.S.

4. [I]n January 1990 [Domco agents] made a representation to Midwest that

Midwest could reach projected sales levels even with Onthank's presence in Des Moines because Onthank's territory would be limited to an area 50 miles around Des Moines.

5. [B]eginning in 1988 [Domco] represented that Domco was growing and increasing its market share in the U.S.

Domco argues here, as it did in the district court, that the record lacks substantial evidence its misrepresentations caused any damage to Midwest. Simply put, Domco asserts the record contains no substantial evidence that Midwest would have been better off had Domco been brutally frank and told Midwest the entire truth. In support of this assertion, Domco points out that Midwest had no more profitable business relationships in the offing and in fact made profit all during the time Domco was lying to it.

Midwest responds that the appropriate analysis is not whether Midwest would have suffered damages even if Domco had told the truth; rather, the appropriate analysis is whether Midwest would have benefited had Domco told the truth.

Implicit in both parties' arguments is that in fraud cases we must examine causation in the context of the damages actually sustained. In that examination we must factor in the appropriate measure of damages applicable to the facts of the case.

■■■ 1. **Measure of damages for fraud cases.** In Iowa we recognize two measures of damages for fraud cases: (1) benefit of the bargain plus consequential damages and (2) out of pocket expenses. *Cornell v. Wunschel,* 408 N.W.2d 369, 380 (Iowa 1987). In *Cornell* we pointed out that each measure of damages has a different purpose. The purpose underlying the benefit-of-the-bargain rule is to put the defrauded party in the same financial position as if the fraudulent representations had in fact been true. *Id.*

■■■ The out-of-pocket-expense rule is an alternative measure of damages applicable when the benefit-of-the-bargain rule will not make the defrauded party whole. *Id.* An obvious example is the situation where the defrauded party has returned the property which was the subject of the misrepresenta-

tion. *Id.* This rule gives the defrauded party the difference between the value of what the party has parted with and the value of what the party has received. *Id.* The out-of-pocket-expense rule assumes that the injured party has returned the property and is entitled to the expenses that the party incurred in accepting and then rescinding the agreement. *Id.*

■■■ When the plaintiff has no out-of-pocket losses, the benefit-of-the-bargain rule must apply, otherwise

> the defrauding defendant has successfully accomplished his fraud and is still immune from an action in deceit.... This is not justice between the parties. The admonitory function of the law requires that the defendant not escape liability and justifies allowing the plaintiff the benefit of his bargain.

Restatement (Second) of Torts § 549 cmt. i, at 115 (1977). Thus, a defrauding defendant will not be heard to say that its intentional misrepresentations were not the cause of any damages to the plaintiff because the plaintiff was not out anything. The public policy as stated in the above quotation from the Restatement will allow a factfinder to find a causal connection between the misrepresentations and injury by holding the defendant to what it has represented to the plaintiff. For this reason, the benefit-of-the-bargain rule and the causation analysis are inextricably intertwined. *See Harris v. Union Elec. Co.,* 787 F.2d 355, 367 (8th Cir.1986) (holding that causation and damages overlap).

Viewed in this light, it is clear why the benefit-of-the-bargain rule allows a defrauded party to recover even though the defrauded party has benefited to some extent. There is a split of authority as to the result when this happens:

> The fact that the transaction into which plaintiff was led was a good bargain notwithstanding the fraud is not always conclusive that plaintiff has sustained no injury; the principle applied in many cases is that plaintiff is entitled to be placed in the situation he would have occupied had there been no fraud, and that his right of recovery must be determined on this basis, al-

though irrespective of such considerations other authorities hold broadly that, since injury is an essential element of fraud, there can be no actionable fraud where plaintiff in fact received a benefit.

37 C.J.S. *Fraud* § 56, at 243 (1997). Thus, those courts, like Iowa, that recognize the benefit-of-the-bargain rule allow a defrauded party to recover even though the defrauded party has benefited. Those that do not recognize the rule allow no recovery but instead require some out-of-pocket loss.

Domco relies on courts that recognize this last theory, that is, the defrauded party must not have benefited but instead must have had some out-of-pocket loss. (In fact, Domco made precisely this argument in its motion for directed verdict.) *See, e.g., Stromberger v. 3M Co.*, 990 F.2d 974, 976 (7th Cir.1993) (holding plaintiff must prove that fraud made plaintiff worse off than plaintiff would have been had there been no fraud; finding that plaintiff who was an at-will employee failed to prove he was worse off when employer fraudulently induced him to resign because employer could fire him for any reason). Thus, "[w]hat this means in a fraud case is that the plaintiff must show that, had it not been for the fraud, he would have been spared an injury and thus would be better off." *Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993). In short, the plaintiff "must compare the situation in which he found himself after the fraud to the situation he would have been in had there been no fraud." *Id.*

Presumably, under this theory, Midwest could not recover. This is because Domco's fraud did not make Midwest worse off than it would have been had there been no fraud: Midwest was still earning profits after the fraud.

**2. Cases applying benefit-of-the-bargain measure of damages.** In a factual scenario not unlike the present one, we have allowed a defrauded party to recover under the benefit-of-the-bargain rule even though the defrauded party benefited to some extent. The plaintiffs' only loss was a decline in profits. We also held the evidence supported a jury finding that the misrepresentation was a proximate cause of the decline in profits. *See Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 564, 567–68 (Iowa 1987).

In *Robinson,* several real estate agents sued a real estate franchisor for damages arising out of the franchisor's sale to them of a real estate franchise. Relying on the franchisor's representation that the franchisor would not solicit any further potential franchises in the plaintiffs' area, the plaintiffs purchased a real estate franchise. The franchisor repeatedly assured the plaintiffs of the exclusive nature of their franchise even while soliciting another franchise to compete against the plaintiffs. We found there was sufficient evidence to support a jury finding that the franchisor was acting in bad faith at the time it represented that it would solicit no other potential franchisees in the plaintiffs' area. *Id.* at 566.

As to the causation issue, the franchisor contended that although the plaintiffs suffered a decline in profits, the plaintiffs failed to show these losses were proximately caused by the franchisor's actions. *Id.* at 567. We applied a benefit-of-the-bargain analysis in determining that the plaintiffs were damaged. *Id.* Because the record showed a decline in profits, we found there was a reasonable basis from which the amount of damages could be inferred or approximated. *Id.* We then applied the two-part test for proximate cause: "but for" and "substantial factor." *Id.* Significantly, we concluded that the "[franchisor's] actions were sufficiently related to the plaintiffs' harm to allow a reasonable jury to regard them as a cause 'using that word in the popular sense, in which there always lurks the idea of responsibility.'" *Id.* at 568 (citation omitted).

Two notions thus emerge from *Robinson.* First, we implicitly recognize damages are related to the causation question. Second, if Domco's rule as spelled out in *Stromberger* and *Midwest Commerce Banking* were the law in Iowa, then *Robinson* could not have turned out as it did. If the plaintiffs were required to show they would have earned more than they did had they known the franchisor was staging to open a competing business, then the plaintiffs would have failed in their proof that the fraud

caused them damages. Their alternative, presumably, would have been to approximate the value of closing their business with the franchisor and opening a more successful real estate business.

*Jacobs Manufacturing Co. v. Brown* presents another similar factual scenario. 19 F.3d 1259 (8th Cir.1994) (applying Missouri law). In *Jacobs*, a manufacturer encouraged a distributor to continue their relationship during a recession and promised that it would not change its distribution system by selling directly to the distributor's customers. While making these representations, the manufacturer was planning, and eventually did, undertake to sell directly to the distributor's customers. Applying Missouri law, the appellate court concluded that the distributor's lost profits were a direct result of the manufacturer's misrepresentations. *Jacobs*, 19 F.3d. at 1265. The court reasoned:

> The [manufacturer] argues [the distributor's] refusal to sign the 1984 distributorship agreement caused [the distributor's] loss of future profits. This argument is misplaced. In the context of fraud, the purpose of "benefit of the bargain" damages is to compensate a defrauded party for amounts that would have been received if the situation had been as the defrauding party represented. Here, these damages compensate [the distributor] for the money it would have made after the market recession ended if its distributorship had continued without change as [the manufacturer] represented, i.e., without [the manufacturer's] direct competition. It is clear to us that [the distributor's] loss of future profits was a direct result of [the manufacturer's] new distribution system, which prevented [the distributor] from profiting from future business as [the manufacturer] had promised [the distributor] would.

*Id.*

In *American Family Service Corp. v. Michelfelder*, the Eighth Circuit reversed a district court posttrial ruling which applied an out-of-pocket theory of damages for reasons not unlike those in *Stromberger* and *Midwest Commerce Banking.* 968 F.2d 667 (8th Cir. 1992). The district court reduced a jury award for the buyers from $250,000 to $57,-000. The $57,000 represented out-of-pocket expenses.

In *American Family,* a prospective buyer sued the sellers and the sellers' attorneys for fraud. The sellers signed a letter of intent to sell their business to the buyer. The letter of intent contained a "no-shop" clause which provided that the sellers would not solicit any proposal to acquire their business or negotiate or enter into any discussions with any person concerning such matter. Contrary to the letter of intent, the sellers did enter negotiations with a third party and eventually sold the business to that party. The sellers' attorneys testified that the sellers' paramount concern at the time was to sell the business. The buyer's expert put the value of the business to the buyer at $3.5 million; the seller's expert computed the value at $2.6 million; the sellers testified that the value to them of the transaction with the third party was $1.5 million. From this testimony, the appellate court concluded that had the sellers dealt exclusively with the buyer as it had promised, the buyer would have bought the business and benefited financially. *American Family,* 968 F.2d at 671–72.

According to the court, the sellers' intent to sell and the value of the transaction

> convinced the jury that had the [sellers] not defrauded [the buyer], that is, if the [sellers] had honored their promise to negotiate exclusively with [the buyer], the buyer would have benefitted financially. Therefore, under Iowa's benefit-of-the-bargain rule, [the buyer] is entitled to the jury's damage determination regarding the [sellers'] fraud.

*Id.* at 672.

Applying the benefit-of-the-bargain rule, the court also allowed separate damage awards against the attorneys because their misrepresentations "exceeded the fraudulent misrepresentations made by the [sellers]." *Id.* at 673–74. The court realized it was difficult to isolate the damage "caused distinctly by the lawyers." *Id.* at 674. Nevertheless, the court concluded that the evidence showed "that the [buyer's] net worth would have increased substantially had [the] ... representations been true." *Id.* This evi-

dence, the court concluded, supported individual verdicts against the lawyers under the benefit-of-the-bargain rule. *Id.*

■ 3. **The merits.** Turning to the facts of this case, we think it would be helpful to restate the false representations Domco made to Midwest. (As mentioned Domco does not dispute these representations were false.) At the beginning of the relationship—October 1988—Domco represented that it was growing and increasing its market share in the United States and that Midwest would be the only stocking distributor of Domco's product in Iowa. In the following year—1989—Domco made projections to Midwest based on Midwest having all the Domco sales from the state of Iowa (even though Domco was courting Onthank and eventually granted it a distributorship). In early 1990, Domco represented to Midwest that Midwest could reach projected sales levels even with Onthank's presence in Des Moines because Domco was growing and/or increasing its market share in the United States. In addition, Domco represented to Midwest that Midwest could reach projected sales levels even with Onthank's presence in Des Moines because Onthank's territory would be limited to an area fifty miles around Des Moines.

To properly address Domco's causation challenge, we must consider the damages sought as the value of Midwest's business had Domco's representations been true. Like the plaintiffs in *Robinson,* Midwest suffered a noticeable—though not total—decline in profits once Domco actually appointed Onthank as a distributor.

Obviously, in *Robinson,* we did not, nor could we, ask "what would plaintiffs have done had they known the truth." If we had to ask, few plaintiffs would recover benefit-of-the-bargain damages where they are still earning profits. Such a rule would allow a defrauding defendant to retain the bounty of its fraud contrary to the public policy underlying the benefit-of-the-bargain rule earlier mentioned.

Based on Domco's initial representations that Domco was growing and increasing its market share in Iowa and that Midwest would be the sole stocking distributor, Mid-west became a Domco distributor. The evidence supports a finding that in doing so Midwest gave up opportunities to pursue other vinyl lines and invested substantial finances, time, and human resources in promoting Domco's product.

Examined in this fashion, the jury's verdict on proximate cause and damages makes sense. The jury heard substantial expert testimony of Midwest's declining profits after the appointment of Onthank. According to Midwest's expert, lost profits went as high as $1,318,167. According to Domco's expert, lost profits were no higher than $646,147.

A reasonable jury could therefore conclude that had Domco's statements been true (that is, that Domco was a growing company and Midwest would remain sole distributor), Midwest would have benefited financially. Midwest would have earned profits substantially higher than it did. Midwest's loss of future profits was a direct result of Domco's appointment of Onthank as sole stocking distributor. This appointment in turn prevented Midwest from profiting from future business as Domco had represented Midwest would. The jury's award of $400,000—lower than the experts' loss-of-profit calculations—was supported by the evidence.

The district court did not err in refusing to grant Domco's motion for JNOV on the fraudulent misrepresentation claim.

**B. Punitive damages.** In its motion for directed verdict, Domco argued that the district court should not submit punitive damages to the jury because it was not engaged in conduct sufficient to meet the requirements of Iowa Code section 668A.1. In its motion for JNOV, Domco elaborated on its grounds for directed verdict, contending that Midwest failed to prove Domco's conduct amounted to willful and wanton disregard of Midwest's rights. In the alternative, Domco asked for a new trial because the verdict for punitive damages was influenced by passion and prejudice. On appeal, Domco contends the district court erred in not granting its motion for JNOV or in the alternative its motion for new trial, raising the same grounds as it did in its posttrial motions.

■ **1. The motion for JNOV: Iowa Code section 668A.1—willful and wanton misconduct.** Iowa Code section 668A.1(1)(a) sets the standard for awarding punitive damages—"willful and wanton disregard for the rights or safety of another." In *Fell v. Kewanee Farm Equipment Co.*, we approved the following definition of "willful and wanton" conduct for section 668A.1(1) purposes:

> "[T]he actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences."

457 N.W.2d 911, 919 (Iowa 1990) (quoting *Prosser and Keeton on Torts* § 34, at 213 (1984)).

Viewing the evidence in the light most favorable to Midwest, we think the following evidence could cause a reasonable jury to conclude that Domco was guilty of willful and wanton misconduct. Through its fraudulent misrepresentations that Midwest would continue to be its sole stocking distributor in Iowa, Domco induced Midwest to continue significant investment in promoting Domco's product while at the same time plotting to supplant Midwest with a new sole stocking distributor. Domco's own witnesses acknowledged the impropriety of its actions. In fact, Abramowicz conceded that Midwest would probably not profit from any new dual distributorship consisting of Midwest and Onthank.

From this evidence a jury could easily find that Domco was acting in willful and wanton disregard of Midwest's rights, having no regard as to what consequences its actions might have as far as Midwest was concerned. The district court did not err in refusing to grant Domco's motion for JNOV on the punitive damages award.

■ **2. The motion for new trial: excessiveness the result of passion or prejudice.** Iowa Rule of Civil Procedure 244 provides for a new trial when a verdict is excessive and appears to have been influenced by passion or prejudice. We allow punitive damages to punish the defendant and to deter the defendant and like-minded persons from committing similar acts. *Economy Roofing & Insulating v. Zumaris*, 538 N.W.2d 641, 654 (Iowa 1995). When we review a punitive damage award for excessiveness, we look to the relationship between the punitive damages award and the wrongful conduct of the offending party. *Id.* at 652. We also consider whether the case was an isolated instance and the financial condition of the defendant. *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 148 (Iowa 1996).

We have already mentioned how Domco's conduct was in willful and wanton disregard of Midwest's rights. Additionally, it is clear the fraudulent conduct of Domco was not an isolated incident. The improper conduct was persistent and continuing until Midwest was entirely cut off from any future profits.

The jury awarded Midwest $750,000 in punitive damages because of Domco's fraud. Domco's assets are more than $250 million. There is no glaring disparity between the amount of punitive damages and Domco's assets that would indicate jury prejudice.

Finally, we consider the fact that Midwest argued for $2.5 million and the jury awarded $750,000. The amount of the jury's award in light of what Midwest was requesting hardly suggests a verdict resulting from passion and prejudice.

We conclude the district court did not abuse its discretion for refusing to grant Domco a new trial on the grounds of excessiveness resulting from passion or prejudice.

**V. Instruction on Justifiable Reliance.**

■ As mentioned, justifiable reliance is an essential element of fraudulent misrepresentation. As to this element, the district court gave the jury the following instruction:

> Concerning proposition No. 4 [Domco knew the representation was false] of Instruction No. 27 [fraudulent misrepresentation marshaling instruction] and No. 4 [Domco knowingly failed to make the disclosure] of Instruction No. 28 [fraudulent concealment marshaling instruction], Domco's agents knew the representation was false if any of the following situations existed:

1. Domco's agent actually knew or believed the representation was false.

2. Domco's agent made the representation without belief in its truth or in reckless disregard of whether it was true or false.

3. Domco's agent falsely stated or implied that the representation was based on his personal knowledge or investigation.

4. Domco's agent made a representation which he knew or believed was materially misleading because it left out unfavorable information.

5. Domco's agent stated its intention to do or not to do something when he did not actually have that intention.

6. Domco's agent knew the representation could be understood in both a true and false manner, and made the representation (a) intending that it be understood in the false sense, (b) having no belief as to how it would be understood, or (c) in reckless disregard of how it would be understood.

7. *Domco's agent['s] special relationship of trust and confidence to Midwest or special source of information made it Domco's duty to know whether the representation was false.*

(Emphasis added.)

Domco contends that the italicized portion of the instruction was not supported by the evidence because as a matter of law there existed no special relationship such as a fiduciary relationship between Domco and Midwest. Thus, Domco insists the district court abused its discretion in not granting it a new trial on the fraudulent misrepresentation claim because an element of that claim—justifiable reliance—is not supported by the evidence.

Even assuming the evidence supported no fiduciary relationship, Domco's contention must fail. Domco did not object to this portion of the instruction. For that reason, Domco preserved no error for our review. *See* Iowa R. Civ. P. 196 (requiring objections to instructions to be made before the instructions are read to the jury and providing "[n]o other grounds or objections shall be asserted thereafter, or considered on appeal."); *Grefe & Sidney v. Watters,* 525 N.W.2d 821, 824

(Iowa 1994) (holding that appellate court may only consider on appeal those objections to instructions previously raised with the trial court).

The district court did not abuse its discretion in refusing to grant Domco's motion for new trial on this issue.

## VI. Evidentiary Rulings.

■ Domco finally contends the district court abused its discretion in admitting evidence from two former Domco distributors and a former Domco employee. Allegedly, Domco made false statements to one distributor that his distributorship was exclusive and about Domco's increasing market share and penetration.

Another distributor testified that Domco induced him to take over a Domco operation in Chicago. Allegedly, Domco falsely represented potential sales and when the dealer began experiencing heavy losses, Domco assured the distributor Domco would take care of him and help him out. According to the distributor, Domco provided no help, causing the distributor to suffer additional losses. In addition, the distributor testified he had an exclusive Domco distributorship in Minnesota which Domco terminated.

Ward, a former Domco employee, testified Abramowicz was a "loose cannon" who "did things behind your back." Ward had set up the Midwest account for Domco and was released in March 1989.

Domco asserts that all this testimony was inadmissible under Iowa Rules of Evidence 404(b) and 403 and that the district court abused its discretion in admitting it.

Iowa Rule of Evidence 404(b) provides that evidence of "other . . . acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." In short, other acts evidence is not admissible just to show a party or witness is a bad person. Such evidence is plainly irrelevant.

Rule 404(b), however, makes other acts evidence admissible for other purposes such as to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity,

or absence of mistake or accident." For these purposes, the evidence is relevant.

We agree with Midwest the challenged evidence was admissible to prove Domco's motive, intent, plan, and knowledge regarding Domco's scheme to defraud Midwest. The testimony was related enough in kind and time to meet the requirements of Iowa Rule of Evidence 403. *See Morley v. Cohen*, 888 F.2d 1006, 1011 (4th Cir.1989) (under Federal Rule of Evidence 404(b), court affirmed admissibility of testimony of unhappy investors as probative on question of intent, a critical element of plaintiff's common law fraud claims); *Zimmerman v. First Federal Sav. & Loan Ass'n*, 848 F.2d 1047, 1056–57 (10th Cir.1988) (under Federal Rule of Evidence 404(b), court affirmed admissibility of past incidents where a bank loaned money and subsequently foreclosed on the loans to support defendant's motive, intent, or plan); *Clarey v. K–Products, Inc.*, 514 N.W.2d 900, 902–03 (Iowa 1994) (employee sued employer for wrongful termination alleging retaliatory discharge for filing workers' compensation claims; holding testimony from nonplaintiff employees that their employer harassed them for filing workers' compensation claims was admissible; testimony tended to show a pattern of conduct and was admissible to show motive, intent, plan, or absence of mistake or accident under Rule 404(b)).

Rule 403 allows the district court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Because Rule 403 allows the district court to exclude relevant testimony, the court should apply the rule sparingly. *Williams v. Hedican*, 561 N.W.2d 817, 832 (Iowa 1997).

We note that the district court permitted Domco to present similar testimony favorable to it from its own friendly distributors. In addition, the record reveals Domco's counsel vigorously cross-examined the distributors Midwest produced. *Cf.* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 703[03], at 703–42 (1994) ("Allowing extensive cross-examination so as to elicit the expert's assumption and test the expert's data may be a more appropriate method of enabling the jury to perform its function than excluding information that passes the tests of relevancy and prejudice."). We conclude the challenged testimony's probative value was not substantially outweighed by the danger of unfair prejudice.

The district court did not abuse its discretion in admitting the testimony.

## VII. Disposition.

In sum, we conclude there was sufficient evidence to support the jury's verdict on the fraudulent misrepresentation and punitive damages claims. The district court correctly denied Domco's motion for JNOV on these claims. In addition, the amount of punitive damages was neither excessive nor the result of passion or prejudice. The district court was well within its discretion in denying Domco's motion for new trial on this issue.

Domco failed to preserve error on its challenge to the instruction on justifiable reliance. The district court did not abuse its discretion in denying Domco's motion for new trial on this issue.

Neither did the district court abuse its discretion in admitting the challenged testimony of Domco's two former distributors and a Domco former employee.

As mentioned, Domco raised numerous issues. We have considered all of them but in this opinion we addressed only those that are dispositive of the appeal.

Finding no error or abuse of discretion, we affirm.

**AFFIRMED.**