MIKE FINNIN FORD, INC. and Mike
Finnin Motors, Inc., Plaintiffs,

v.

AUTOMATIC DATA PROCESSING,
INC. and ADP, INC.,
Defendants.

No. C99–1037 MJM.

United States District Court,
N.D. Iowa,
Eastern Division.

Oct. 19, 2001.

Les V. Reddick, Kane, Norby & Red-
dick, PC, Dubuque, IA, for Plaintiffs.

David A. Hacker, Simmons, Perrine, Al-
bright, Ellwood, Cedar Rapids, IA, for De-
fendants.

## OPINION and ORDER

MELLOY, District Judge.

In this diversity action, Plaintiffs Mike Finnin Ford, Inc. and Mike Finnin Motors, Inc. (collectively Plaintiffs or "Finnin") allege fraud, breach of contract and breach of warranty claims against Defendants Automatic Data Processing, Inc. and ADP, Inc. (collectively Defendants or "ADP") in relation to Defendants' negotiation and performance of an agreement to provide certain computer-related products and services for use in Plaintiffs' Iowa automotive dealerships. Defendants deny the allegations and have counterclaimed for defamation. Presently before the Court is Defendants' motion for partial summary judgment by which Defendants seek dismissal or limitations on each of Plaintiffs' claims against them.

### I.

The standard for granting summary judgment is well established. A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the Court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Montgomery v. John Deere & Co., 169 F.3d 556, 559 (8th Cir. 1999). A fact is material if it might affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is genuine "if it has a real basis in the record." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir.1992) (citing Matsushita, 475 U.S. at 586–87, 106 S.Ct. 1348).

The party moving for summary judgment bears the "initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of genuine issue." Celotex, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the opponent must go beyond the pleadings and designate specific facts-by such methods as affidavits, depositions, answers to interrogatories, and admissions on file-that show there is a genuine issue for trial. See Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. 2548. The evidence of the nonmoving party is to be considered as true, and justifiable inferences arising from the evidence are to be drawn in his or her favor. Anderson, 477 U.S. at 255, 106 S.Ct. 2505. However, if the evidence of the nonmoving party is "merely colorable," or is "not significantly probative," summary judgment may be granted. Id. at 249–50, 106 S.Ct. 2505. Thus, although the nonmoving party does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances that the nonmoving party relies upon must "attain the dignity of substantial evidence and must not be such as merely to create a suspicion." Metge v. Baehler, 762 F.2d 621, 625 (8th Cir.1985). In essence, the evidence must be "such that a reasonable jury could find a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

### II.

Plaintiffs have brought both breach of contract claims and fraud claims against Defendants in conjunction with Defendants' failure to provide, as contractually promised, certain marketing software for Plaintiffs' automotive dealerships. For purposes of this motion, it is undisputed that Plaintiffs contracted, on December 31, 1997, for, among other products, Defendants' Relationship Marketing System (RMS) software and that RMS was not

delivered in spring 1998, as anticipated by the contract. It is also uncontroverted that at the time the contract was negotiated, executed and to be performed, RMS was commercially unavailable and could not be delivered by Defendants. While the relationship of these facts to the breach of contract claims is relatively straightforward, a more detailed explanation of the history of the parties and negotiation of the specific contract at issue provides context for discussion of the fraud claims. The facts included herein are undisputed or construed in the light most favorable to Plaintiffs, the nonmoving party. As relevant, additional facts will be discussed in the Court's subsequent analysis.

Mike Finnin owns two automotive dealerships in Dubuque, Iowa. At both dealerships, a significant amount of computer hardware and software is used to systematize various aspects of the dealership operations. ADP had provided some computer-related products and services to Finnin since the early 1980s. In 1997, Finnin began discussions with ADP as well as other computer service providers regarding his future business.

Mike Urmie, an employee of ADP, was responsible for helping automotive dealership clients, such as Finnin, evaluate their ongoing needs for business solutions and technologies. In this capacity, Urmie had discussions with Finnin throughout 1997 regarding the benefits of extending and upgrading Finnin's relationship with ADP through an amended contract (hereinafter "the contract amendment"). One aspect of ADP's proposed upgrade was the addition of ADP's Relationship Marketing System (RMS) software which was to significantly enhance Finnin's customer profiling and marketing capabilities. Finnin was first introduced to RMS in June 1997 when he attended a regional meeting held by ADP to inform dealership principals about ADP products. At that meeting, Finnin heard a presentation on, and received promotional literature regarding, the attributes of RMS. Marketing material given to Finnin explained that "this unique system compiles the customer information into an easy-to-use format" and represented that "with the strength of RMS, you will be able to increase loyalty and build dealership sales." Among other benefits, RMS would: (1) consolidate customer information and purchase history from all aspects of the dealership operations; (2) consolidate multiple customers to allow the dealer to track "family" purchases; and (3) facilitate the creation of custom mailings to specified groups of customers by identification of common variables within the full customer database. Finnin was informed that RMS software was an "ADP exclusive" in that ADP was the only supplier to provide that specific combination of capabilities within one product.

Urmie testified that Finnin expressed a strong interest in RMS because it would allow the dealerships to refine their marketing efforts to their clients and improve customer satisfaction. Finnin also testified to that effect, explaining that without a coordinated customer information system he is unable to track customers' overall use of the various divisions of the dealership operations—sales, service parts, purchase history, etc.—nor can he track purchases within and among family members. RMS software, as explained to Finnin through ADP materials and agent representations, would solve these and other marketing problems.

Finnin signed the contract amendment on December 31, 1997.[1] The amendment

---

1. The contract amendment became effective on February 18, 1998, when signed by an authorized officer of ADP.

called for installation of RMS, along with other computer upgrades, in spring 1998. Finnin maintains that the exclusive marketing capability offered by RMS was the primary reason he decided to extend his contract with ADP. Throughout 1998, when Finnin inquired as to the delay in delivery and installation of RMS, he was repeatedly told that it would be forthcoming shortly. To this day, RMS has not been installed at Finnin's dealerships.

## III. Discussion

Defendants' motion for partial summary judgment seeks dismissal or limitations on each of Plaintiffs' claims against them. In response to Defendants' motion, Plaintiffs indicated that they did not intend to resist some of the issues raised and would not pursue certain claims. The Court will briefly note the unresisted issues before addressing the remaining disputes.

### A. *Unresisted issues:*

Among the rulings sought by Defendants through their motion are the following: (1) partial summary judgment with regard to the breach of contract for failure to deliver RMS to the effect that the measure of damages is limited as specified in the contract and Plaintiffs are precluded from recovering incidental or consequential damages; (2) summary judgment on the breach of contract and warranty claims as they relate to the alleged failure to provide Plaintiffs with software containing consolidated accounting capabilities; (3) summary judgment on the breach of contract claim as it relates to an alleged failure to provide sufficient computer training. These aspects of Defendants' motion are unresisted by Plaintiffs. *See* Pl.'s Resistance, doc. no. 33, ¶¶ I–III (acknowledging non-resistance regarding measure of damages and intent not to pursue training and consolidated accounting-related claims). Accordingly, Defendants' motion as to these issues will be granted.

### B. *Resisted Issues—The Fraud Claims:*

The remaining issues in Defendants' motion relate to Plaintiffs' fraud claims. Defendants seek summary judgment on the claims or, in the alternative, a ruling by the Court that Plaintiffs are limited to the damages specified in the contract. The parties agree that Iowa law governs this issue. *See Dethmers Mfg. Co., Inc. v. Automatic Equip. Mfg. Co.*, 23 F.Supp.2d 974, 1004–1005 (N.D.Iowa 1998) (discussing Iowa application of Restatement (Second) of Conflicts of Laws § 145 for determining choice of law in tort claims, including consideration of place of injury, place of conduct leading to the injury, domicile of the parties, and the place where any relationship between the parties is centered).

### *Establishing Fraud*

Plaintiffs' fraud claims assert that Defendants misrepresented the status of RMS in order to induce Plaintiffs to commit to an extended contract with Defendants. Plaintiffs contend that Defendants knew well before Plaintiffs' execution of the contract on December 31, 1997, that RMS was not performing—or even publicly available—as represented in ADP marketing literature and by Defendants' agents and further knew that there was a strong likelihood that RMS would not be available under the terms promised in the contract. Plaintiffs were thus fraudulently led to believe that they were signing a contract which would give them access to Defendants' "exclusive" RMS product, touted as the "leading automated system for customer contact" by which they could "put [RMS] to work at [their] dealership today." Defendants assert that Plaintiffs cannot show that any material misrepresentations were "knowingly" made. In this respect, Defendants implicitly argue that the represented status of RMS prior to execution of the contract is not material

to Plaintiffs' fraud claims because the contract did not contemplate delivery of RMS until spring 1998. Thus, Defendants argue, the only relevant inquiry is whether at the time Defendants promised delivery of RMS in spring 1998, they knew that they could not fulfill that promise. Defendants maintain that throughout 1997, up to and including Plaintiffs' execution of the contract, Defendants fully and reasonably believed that they could provide RMS within the time frame anticipated by the contract and that Plaintiffs cannot raise a triable issue to the contrary.

To prove fraudulent misrepresentation under Iowa law, Plaintiffs must establish the following seven elements by a "preponderance of clear, satisfactory, and convincing evidence":

1. Defendants made a representation to Plaintiffs.

2. The representation was false.

3. The representation was material.

4. Defendants knew the representation was false.

5. Defendants intended to deceive Plaintiffs.

6. Plaintiffs acted in reliance on the truth of the representation and were justified in relying on the representation.

7. The representation was a proximate cause of Plaintiffs' damage.

8. The amount of damage.

*See Magnusson Agency v. Public Entity Nat'l Co.-Midwest d/b/a PENCO,* 560 N.W.2d 20, 27–28 (Iowa 1997) (citing *Hyler v. Garner,* 548 N.W.2d 864, 871 (Iowa 1996), for elements, and *McGough v. Gabus,* 526 N.W.2d 328, 331 (Iowa 1995), for burden). *See also Hall v. Wright,* 261 Iowa 758, 156 N.W.2d 661, 666–67 (1968)

(explaining quality and quantity of evidence required to satisfy plaintiff's heightened evidentiary burden in fraud cases).[2]

Under Iowa law, a statement of intent to perform a future act is actionable if, when made, the speaker had an existing intention not to perform. *Robinson v. Perpetual Services Corp.,* 412 N.W.2d 562, 565 (Iowa 1987). Knowledge of the falsity of a material representation can be proved by showing that the defendant had actual knowledge of its falsity or possessed reckless disregard for its truth. *Magnusson,* 560 N.W.2d at 28 (citing *Hyler,* 548 N.W.2d at 871); *Grefe v. Ross,* 231 N.W.2d 863, 867 (Iowa 1975) ("[I]ntent to deceive and the closely related element of scienter are shown not only when the speaker has actual knowledge of the falsity of his representations but also when he speaks in reckless disregard of whether his representations are true."). Intent to deceive is closely related to knowledge, and the same general analysis applies. *Magnusson,* 560 N.W.2d at 29. The mere " 'fact the agreement was not performed does not alone prove the promissor did not intend keeping it when it was made.' " *Robinson,* 412 N.W.2d at 565 (quoting *Lamasters v. Springer,* 251 Iowa 69, 99 N.W.2d 300, 303 (Iowa 1959)). In other words, "a false statement innocently but mistakenly made will not establish intent to defraud unless the statement was recklessly asserted." *Magnusson,* 560 N.W.2d at 28 (citation omitted).

In explaining the parameters of these principles, the Iowa Supreme Court has, on numerous occasions, quoted with approval an excerpt from Prosser's treatise on the law of torts:

**2.** Because Defendants' summary judgment challenge is premised solely on their contention that no material representations were *knowingly* made, the Court will assume for purposes of this motion only that the remaining elements of Plaintiffs' fraud claim can be established.

Unless the present state of mind is mis-stated, there is of course no misrepresentation. When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action, either for deceit, or equitable relief. Otherwise any breach of contract would call for such a remedy. The mere breach of a promise is never enough in itself to establish the fraudulent intent. It may, however, be inferred from the circumstances, such as the defendant's insolvency or other reason to know that he cannot pay, or his repudiation of the promise soon after it is made, with no intervening change in the situation, or his failure even to attempt any performance, or his continued assurances after it is clear that he will not do so.

W. Prosser, The Law of Torts § 109, at 730–31 (4th ed.1971), *quoted in Robinson,* 412 N.W.2d at 565–66. *Accord Magnusson,* 560 N.W.2d at 28–29 (also quoting Prosser § 109).

█ Defendants argue that, on applying the above-cited principles, summary judgment is warranted because all Plaintiffs can show is that RMS was never delivered. In support, Defendants offer the deposition testimony by Mike Finnin and his wife wherein the Finnins repeatedly cite the non-delivery of the product as the basis for their fraud claim. Defendants also offer undisputed record evidence purportedly supporting the conclusion that Defendants' promise to provide RMS in spring 1998 was neither knowingly false nor recklessly asserted—even if it ultimately turned out to be mistaken. In this respect, Defendants rely primarily on the deposition testimony of Marcella Fink, the RMS project manager. Fink confirmed that RMS had been in development since at least 1996 with an initial targeted general release date of fall 1997. She described the RMS development process, including the preparation of an operating version of the software and field testing in 1997. Field test data demonstrated issues yet to be resolved but, as of late 1997, Fink still felt that with "a really aggressive" schedule RMS could be "completed" by late January 1998. She testified that through 1997 there was never reason to believe that RMS could not be in general release by May or June of 1998. Defendants contend that in light of the Finnins' and Fink's testimony, Plaintiffs cannot raise a genuine issue of material fact regarding the known falsity of Defendants' contractual promises.

In response, Plaintiffs reject Defendants' characterization of the record and argue that significant evidence beyond the failure to perform supports a finding of known falsity or reckless disregard. Plaintiffs point primarily to the lengthy production history of RMS to demonstrate marked and ongoing problems that purportedly belie Defendants' representations to the contrary. Significantly, Plaintiffs, too, rely on Fink's deposition testimony. That testimony arguably reveals a series of somewhat inconsistent and/or changing time frames for completion of RMS and general release of the product. Fink first testified that the general release date was anticipated for fall 1997. By late 1997, however, she predicted that the product would not be "completed" until the end of January 1998. This is in part because review of the field test data demonstrated "significant issues" and "bugs" still to be resolved. And finally, her testimony reveals that even a January 1998 "completion" date was not synonymous with general release or delivery to Plaintiffs. Rather, Fink testified that the predicted January completion date should have allowed for general release by May or June of 1998. Thus, per Plaintiffs, at the time that the amended contract was signed, on December 31, 1997, Defendants were well aware that RMS had a history of develop-

ment setbacks and delays and that relatively recent tests had confirmed that those problems had not been fully resolved.

After thoroughly reviewing the entire record and granting all reasonable inferences in favor of Plaintiffs, the Court concludes that summary judgment would be inappropriate in this case. Initially, the Court notes that it is not entirely persuaded that this is merely an "intent to perform a future act" case as Defendants characterize it. Given the stark and consistent representations to Plaintiffs that they were contracting for something that was already a tried and tested product currently proving valuable in the marketplace, it seems an arguable claim can be made that Defendants' representations in 1997 regarding the "existing" capabilities and performance of the product are also actionable. On this point, the Court finds particularly relevant the RMS marketing brochure provided to Plaintiffs in 1997. The high-quality brochure is written entirely in the present tense, includes half-page photos depicting "purchasers" using the software to view customer profile information, and, indeed, closes with high-lighted language directing the purchaser to "[p]ut the ADP Relationship Marketing System to work at your dealership *today* and build your customer loyalty." (Emphasis added). There is no hint that the product was unavailable for installation at that time. Similarly, Defendants' 1996 Annual Report characterizes RMS as "the *leading* automated system for customer contact, from initial prospect through the purchase life cycle and ongoing service." (Emphasis added). Again, no reader would be apprised that RMS was merely in development at that point. Thus Plaintiffs were entirely at the mercy of Defendants to disclose the fact that, contrary to everything presented, the product for which Plaintiffs were contracting was still in development—information that this Court would deem material were it the prospective purchaser.

Even accepting Defendants' theory of the case, however, the Court concludes that Plaintiffs have demonstrated a genuine issue regarding whether Defendants' representations regarding delivery of RMS in spring 1998 were knowingly false. Given the time frame for performance contemplated in the contract, a jury could reasonably conclude that Defendants' vigorous adherence to its position that they could provide RMS under the terms of the contract was, at least, reckless. While Defendants insist on the reasonableness of their belief that the product would be completed in the relatively short window between Plaintiffs' execution of the contract and the targeted installation date, no such conclusion is required by the record. In light of the history of the product's development, its acknowledged problems in late 1997 and its non-viability as a working product as late as December 31, 1997, a jury could reasonably find that Defendants' position that there were no foreseeable problems with the contractual delivery date was, if not represented with actual knowledge of its falsity, at least asserted with reckless disregard as to its truth. *See Robinson*, 412 N.W.2d at 566 (affirming jury verdict on fraudulent misrepresentation claim based on "[a]ll of [the] evidence, taken together" which provided the "requisite quantum and quality of evidence" to support the verdict even though the court "might as fact finder have reached a different verdict").

In sum, there is at least a permissible finding that this is not a scenario in which there was merely "a false statement innocently but mistakenly made." Rather, on the record as it stands, this may reasonably be characterized as a case where, throughout their discussions and negotiations with Plaintiffs, Defendants repeated-

ly and consistently represented a product as currently existing and excelling in the marketplace. Even assuming that the contract was not to be performed until the spring of 1998, Plaintiffs have sufficiently demonstrated a genuine issue regarding Defendants' knowledge at the time of the contract execution as to the improbability of providing RMS software in that time frame. Accordingly, Defendants' motion for summary judgment as to Plaintiffs substantive fraud claims will be denied.

### Damages

■■■ Under Iowa law, a plaintiff in a fraud action can elect to rescind the contract or affirm it and bring an independent action for damages. *Phipps v. Winneshiek County,* 593 N.W.2d 143, 145 (1999). Defendants argue that application of this rule in the case at bar drastically limits the fraud damages potentially available to Plaintiffs. In this respect, Defendants seek a ruling that by opting to affirm the contract (rather than seeking rescission), Plaintiffs are limited to the damage limitation provisions in ¶ 15 of the M.S.A. § which preclude recovery of "special, indirect, incidental or consequential damages which client may incur or experience on account of entering into or relying on this agreement and the schedules hereto."[3] Plaintiffs dispute Defendants' interpretation of the law, arguing instead that a plaintiff may elect to affirm a fraudulent contract and still bring an independent tort action which would not be bound by limiting provisions of the contract.

Neither party cites, nor has this Court found, case law squarely addressing this precise issue—the effect of remedy election on recoverable fraud damages where the affirmed contract purports to limit some of those damages. Defendants devote little argument to this issue, apparently relying in part on their damages in their challenge to Plaintiffs' breach of contract claims.[4] That discussion is not particularly relevant, however, as Plaintiffs' fraud claims are grounded in tort—not contract—law, and there are significant differences between Iowa's treatment of contract remedies and tort remedies. *See, e.g., Midwest Home Distributor, Inc. v. Domco Indus. Ltd.,* 585 N.W.2d 735, 739 (Iowa 1998) (discussing rationale underlying damages theory in fraud claims). This is particularly true with regard to misrepresentation claims in which the heightened burden of proof placed on plaintiffs is rewarded by a generously-construed remedy theory. *See id.*

■■■ This Court recently discussed the damages available to a successful fraud plaintiff under Iowa law. *See Fibred Properties Limited Partnership v. City of Iowa Falls,* No. C99–38 MJM (Order dated Sept. 20, 2001), at 26–27. In that opinion, the Court explained that Iowa recognizes two measures of damages for fraud cases: (1) benefit of the bargain plus consequential damages and (2) out of pocket expenses. *Domco,* 585 N.W.2d at 739; *Cornell,* 408 N.W.2d at 380. Each measure of damages has a different purpose. The purpose underlying the benefit-of-the-

---

**3.** Another provision in Paragraph 15 would appear to limit recoverable damages to "the lesser of (i) the amount of actual damages incurred by Client, and (ii) the amount which will not exceed one month's average total monthly charges paid by Client for the particular Services, Software, Equipment, Support Services or Maintenance Services as to which Client's claim relates . . ." Defendants assert

that because RMS was never delivered Plaintiffs never paid for that particular service and thus, under the contract, no damages are recoverable.

**4.** As noted in Part III–A, above, Plaintiffs do not dispute that their damages for breach of contract are limited as per the contract.

bargain rule is to put the defrauded party in the same financial position as if the fraudulent representations had in fact been true. *Domco*, 585 N.W.2d at 739. The out-of-pocket-expense rule is an alternative measure of damages applicable when the benefit-of-the-bargain rule will not make the defrauded party whole. *Id.* *See also Robinson*, 412 N.W.2d at 567 ("Generally, a successful plaintiff in a fraud case is entitled only to the benefit of its bargain, unless additional out-of-pocket damages are necessary to make the plaintiff whole.") (citations omitted). As the Iowa Supreme Court has explained: [w]hen the plaintiff has no out-of-pocket losses, the benefit-of-the-bargain rule must apply, otherwise:

> the defrauding defendant has successfully accomplished his fraud and is still immune from an action in deceit .... This is not justice between the parties. The admonitory function of the law requires that the defendant not escape liability and justifies allowing the plaintiff the benefit of the bargain.

*Domco*, 585 N.W.2d at 739 (quoting Restatement (Second) of Torts § 549 cmt. i, at 115 (1977)).

This case law reflects the significant distinction under Iowa law between a contract claim and a tort claim, and squarely places fraud within the latter category. It follows that, once proven, the tort of fraudulent misrepresentation merits the generous remedies available under Iowa's tort law. Implicit in this conclusion is a recognition that the right to elect a remedy is fundamentally a benefit to the plaintiff. It permits the plaintiff to assess his situation upon discovery of the fraud and then decide whether rescission or affirmation is better for him. There are many reasons why a plaintiff may opt for the latter—e.g., obligations to third parties which flow from the initial contract, the object of the contract is unavailable elsewhere, etc.— and it does not follow that an affirming

plaintiff waives his right to any claim for tort damages merely because he agrees to be bound by the contract regarding contractual matters. He retains the right to be placed in the same financial position as if the fraudulent representations had in fact been true. Otherwise, a defendant could evade application of Iowa's tort remedies by including a limited damages clause in a contract even though, absent the tort, no contract would have been executed.

■ The Court is not entirely immune to the initial intuitive appeal of the proposition advocated by Defendants—after all, where the injury suffered by Plaintiffs is intimately related to the subject matter of the contract and Plaintiffs opt to affirm that contract despite Defendants' fraud, it sounds reasonable to hold them to the limiting damage provisions of the contract. However, as the discussion herein demonstrates, on even slightly closer analysis it becomes clear that Defendants' position is logically suspect and undermines the spirit of Iowa's well-settled treatment of recoverable damages in fraud cases. Thus, when viewed appropriately, the issue before the Court is, ultimately, a relatively simple one with an equally simple answer: Defendants cannot use a contract obtained by a fraudulent misrepresentation to contract away liability for fraudulent misrepresentation. *Accord Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998) (finding tort damages recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffered an economic loss related to the subject matter of the contract: "[To hold otherwise] ignores the fact that an independent legal duty, separate from the contract itself, precludes the use of fraud to induce a binding agree-

ment."). Accordingly, Defendants' motion to limit damages on the fraud claims to those specified in the parties' contract will be denied.

## ORDER

In accordance with the opinion filed herewith, it is ORDERED:

1) With regard to Counts I and V— Breach of contract:

a) Defendants' motion for partial summary judgment regarding the measure of damages for the alleged failure to provide the RMS system contracted for is Granted.

b) Defendants' motion for summary judgment regarding the alleged failure to provide Plaintiffs with adequate training under the contract is Granted.

c) Defendants' motion for summary judgment regarding the alleged failure to provide Plaintiffs with consolidated accounting software capabilities is Granted.

2) With regard to Counts III and VII— Breach of warranty:

Defendants' motion for summary judgment regarding the alleged breach of warranty as related to consolidated accounting software is Granted.

3) With regard to Counts II and VI— Fraud:

a) Defendants' motion for summary judgment on these claims is Denied.

b) Defendants' motion for partial summary judgment limiting damages on the fraud claims to those specified under the contract is Denied.